(44 South. 990.)

No. 16,806.

PARRENIN et ux. v. CRESCENT CITY STOCKYARD & SLAUGHTERHOUSE CO., Limited.

(Nov. 4, 1907. Rehearing Denied Dec. 2, 1907.)

1. MASTER AND SERVANT—INJURY TO SERVANT—DUTY OF MASTER.

It is the duty of those employing persons of whom, from their youth, ignorance, or inexperience, it may be assumed that they are unlikely to use the precautions of age, knowledge, and experience, to protect them, as far as may be reasonably possible, from the consequences of their failure so to do. And whether the employé be young or old, ignorant or well informed, experienced or otherwise, the employer must furnish him with a reasonably safe place in which, and reasonably safe appliances with which, to do his work, or else must show where injury is sustained that the employé knew, or ought to have known, the danger to which he was subjected.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 141.]

2. SAME—FAILURE TO WARN MINOR SERVANT.

Held, that defendant is liable to the parents of a minor for injuries to the latter and the loss of his life resulting from his falling into a vat of boiling oil and water whilst engaged in skimming the same with unsafe and insufficient appliances, furnished by defendant without warning of the danger to be apprehended from doing the work under such conditions.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 314.]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; John St. Paul, Judge.

Action by Hypolite Parrenin and wife against the Crescent City Stockyard and Slaughterhouse Company, Limited. Judgment for plaintiffs, and defendant appeals. Affirmed.

Cage, Baldwin & Crabités, for appellant. Armand Romain, for appellees.

### Statement of Case.

MONROE, J. This is a suit by the parents of a minor for the damages resulting to him and to them from injury received by him, causing his death, through the alleged negligence of defendant in failing to provide him with safe and proper appliances for the work to which he was assigned, and to warn him of the danger to which he would be subjected. The answer denies negligence on the part of defendant and alleges contributory negligence on the part of the minor.

The facts, as we find them from the evidence in the record, are as follows:

Plaintiffs are laboring people, who live in the country and earn their livelihood by the cultivation of rice. They also assist the parents of one or the other of them (referred to in the testimony as the grandparents of the minor), to whose support the minor is said to have contributed $6 out of $9 per week received by him as wages from

defendant. At the date of the accident, the minor was between 20 and 21 years of age, active, industrious, intelligent, and in good physical condition. He had been employed by defendant for three or four months as a common laborer in its rendering establishment, working usually upon the first floor, and, for the most part, skimming tallow from the vats in which the boiling or rendering is done, the tallow vats being wooden boxes, alongside of which are stationary runways, or platforms, so elevated as to enable the operator, by leaning over the sides of the vats, to reach and skim their contents. On the third floor of the building there are other vats, in one of which neat's-foot oil is rendered, from certain parts of the animals slaughtered by defendant, by means of water heated to 180° or 190° F., which oil is skimmed as it rises, and is deposited in a barrel which stands by the side of the vat. The vat in question, like the tallow vats, is an oblong wooden box, and is described by defendant's foreman as being about 6 feet long by 3½ or 4 feet in width, and about 3 feet in depth, and it is elevated 6 or 8 inches in order that the floor may be cleaned underneath it, so that the upper edges of the vat's sides are about 3 feet 8 inches above the level of the floor. These vats (there being four of them) are not provided with stationary platforms alongside of them for the use of the workman who does the skimming, as are those of the first floor, but with a movable, poorly constructed, rickety affair, indifferently called bench, steps, or stool, consisting of two steps, without risers, supported in the rear by upright pieces with braces extending from one to the other; the top of the top step, constituting the platform, being 2 feet high and 3 feet long by 16 or 18 inches in width and extending several inches over its supports, both in the rear and at the ends, so that the weight of a man imposed upon the rear edge or upon either end would be likely to cause it to tilt. The foreman testifies, and it is conceded, that it is necessary to stand on the platform in order to skim the vats, and that it is moved from one vat to the other as occasion requires. Being asked, "Is there anything that would have prevented the building of a stationary platform around that vat?" (referring to the oil vat), he replied, "No, sir; nothing at all." Being asked, "Isn't it a fact that this stationary platform is safer and more secure than the movable platform?" he replied, "I should regard anything stationary as more safe than something movable." And to the further question, "There is no doubt about that in your mind?" he replied, "None at all." He states that the skimmer provided by defendant for use in connection with the vats in question is an ordinary soap maker's "flat," and, being asked to describe it, says:

"Well, the flat is usually about a foot in width, about 15 or 16 inches in length, and about 4 or 5 inches deep, with an over, anchor or arch, handle."

This description may perhaps be made more intelligible by our saying that the skimmer, or "flat," which was produced as an exhibit, is made of tin, in the form of an open cake basket, with an arch of tin going from one side to the other, and another piece constituting the handle, extending from the middle of the arch to the rear upper edge of the vessel, so that in using it the hand of the operator is immediately over the vessel, from which it follows that he is unable to skim any surface beyond the reach of his arm, as he might do with a long handled skimmer, and must necessarily lean over the vat in order to do any skimming at all. Under the circumstances as thus stated—the vat being 6 feet long, 3½ or 4 feet wide, and say 3 feet 8 inches high (from the floor), and the barrel in which the skimmed oil is poured standing near one end—it follows

that, as the workman stood on the bench (2 feet high), the upper edge of the vat (3 feet 8 inches above the floor) could not have come much above his knees (the difference between the height of the bench and of the vat being 18 inches), and that if the bench were on the side, near the middle of the vat, he must have reached 3½ or 4 feet to skim the oil. Upon the other hand, if (as may have been the case) the bench was necessarily placed at the end of the vat, then, after reaching as far as he could, the workman must have gotten off the bench and skimmed the oil, at the other end, from the floor, walking back to the barrel with each skimmer full.

In order, however, to obviate the necessity of the workman's either reaching so far or thus traveling back and forth, it seems that a paddle was used, whereby the oil, floating on the surface of the water, could be moved within easy reach, but it does not appear that Parrenin was ever informed of that fact, and, though defendant produced the bench and skimmer, as exhibits, no paddle was found about the vat after the accident.

On the subject of the use of the paddle, the foreman testifies as follows:

"Q. By moving the platform around the vat, can the skimmer get at the oil easily? A. Yes; he can step down from the platform and paddle the oil over with a small paddle, and that is the usual way of doing it. Q. Is that the proper method of doing it? A. Yes, sir. Q. When done in that manner, is there any danger of doing it? A. No, sir; I don't think so."

On Saturday, May 19, 1906, one Lepage, who did the skimming on the third floor, informed the foreman that he would be absent the next day, and the foreman asked the minor, Parrenin, whether he would take his place and make an extra half day, to which Parrenin replied in the affirmative, and he accordingly made his appearance the next morning (Sunday, May 20th), before 7 o'clock,

and (steam having been kept up, as we infer) immediately began to skim the vat. There was no other workman on the third floor at the time, but a lad named Stricker and a man named Sabatier were on the second floor, and, within a few minutes (to quote Stricker's testimony), "they heard hollering," whereupon Stricker ran up the stairs, and found Parrenin standing on the floor about 15 feet away from the vat, with his clothing wet. His condition and apparent suffering were such that the witness did not feel equal to the emergency, so, calling to Parrenin to come downstairs, he himself led the way in search of assistance, and Parrenin followed, screaming as he came, but up to that time having said nothing to Stricker. Being asked as to the position of the movable platform or bench at the time that he first went upstairs, Stricker says:

"One end was touching the box, the vat, and the other end was about six inches away from the vat."

He further says upon that subject:

" * * * After he (Parrenin) came down, he claimed he fell in the neat's-foot oil vat and the bench was six inches away."

He also testifies that he (afterwards, no doubt) found the skimmer in the bottom of the vat, and that he found human flesh, or skin, on the edge of the vat. The next person who reached Parrenin was Sabatier, who had also heard the "hollering," and who first saw Parrenin as he was coming down the stairs to the second floor, upon reaching which Sabatier assisted him in removing his clothing. Being asked, "Did you ask him how it happened?" this witness replied:

"Yes, sir; he told me he reached over and the bench slipped and his left hand saved him."

On his cross-examination he testified in part as follows:

"Q. What were the words that the chap told you as to how it happened? A. He came downstairs and hollered. A. And what else? A.

One minute, when he got downstairs, he asked me to pull off his clothes. He was burning up. I said, 'Let me take time.' He said, 'No; pull them off. They burn me too much.' I asked him how he done it, and he said he reached over and he slipped and his left hand saved him. Q. Didn't he tell you that his foot slipped? A. No, sir; he told me, 'I slipped and my left hand saved me.' * * * By plaintiff's counsel: Q. I ask you, Mr. Sabatier, whether Parrenin, while you were taking off his clothes—whether he told you anything about the bench? A. Yes, sir; he said that the bench slipped, and his left hand saved him, and he slipped."

The witness further testifies that he found the bench somewhat later when he went to the third floor, with "the right side about a half foot away from the vat and the left side was about a foot and a half away."

It may be here remarked that the witnesses all agree that the bench was somewhat removed from the vat, more so at one end than at the other, the consensus of the testimony being that one end was about six inches out, and the other near, or touching, the vat. Later in the day Mr. Damien, the secretary of the defendant company and Mr. Daboval, its general manager, visited the scene of the accident, and the latter, while testifying in the case, being asked, "One corner of the bench was six inches from the vat and the other corner touching, or almost touching, the vat?" replied:

"Yes, sir; that is correct, and I called Mr. Damien's attention to that particularly at the time, because we discussed the almost impossibility of that bench ever moving under the pressure of that man's weight. I don't think he weighed over 140 pounds."

It has been stated that the bench and skimmer used by Parrenin were found and produced, but no paddle was discovered, and it does not appear that there was any on the premises on the morning of the accident. It is shown that two Sundays before the accident Parrenin had taken the place of the third floor man, as he did on the day of the accident, but it is also shown that neither then nor on the day of the accident were any instructions given him as to the manner in which the work should be done, or any warning as to the danger attending it, and his experience in skimming from a movable bench, or platform, appears to have been confined to the two occasions mentioned, upon the second of which he lost his life. The evidence shows that, as results of the accident, portions of Parrenin's skin and flesh came off with his clothes, and that after suffering intense agony, save so far as alleviated by the administration of morphine, for about five hours, he died in the Charity Hospital.

The case was tried in the district court without a jury and the judge awarded the plaintiff $2,500. Defendant has appealed, and plaintiffs answer, praying for an increase in the award.

### Opinion.

The learned judge a quo did not reduce his reasons for judgment to writing, but defendant's counsel inform us that he subsequently stated, or repeated, them as follows (quoting from counsel's brief):

"That the testimony shows that the employés who skimmed the vats on the third floor were in the habit of using a little wooden paddle with which they would paddle or drive the oil on the top of the water from one part of the vat to the place where the bench was situated and near which the barrel into which the oil was thrown, rested, and that the evidence indicated to him that Parrenin had not used the paddle, and he stated that the probable cause of Parrenin's falling into the vat was that he was ignorant of the use of the paddle, and had undertaken consequently to lean over too far to skim the oil when his foot slipped and he fell in; and he [the judge] considered that, when Parrenin was designated to skim the vat, the foreman should have informed him that it was proper to use the paddle, and his failure to do so constituted negligence, and rendered the defendant liable."

We concur in the conclusion of our Brother of the district court to the effect that Parrenin was not informed as to the use of the paddle, and not having, and not using, it, was induced to lean further over the scalding liquid than would otherwise have been necessary, and hence the accident. And we

also concur with the judge in the opinion that the foreman should have informed Parrenin that it was proper to use the paddle, and that his failure to do so constituted negligence, which, under the circumstances of the case, renders the defendant liable. We are, however, inclined to think that the deceased lost his equilibrium by the slipping back of the bench upon which he was standing and which appears to us to have been an unsafe and unsuitable appliance, more particularly when furnished for the use of a person who had been accustomed, during the short time that he had worked in that line, to do his skimming, from a stationary platform. Counsel argue, from the testimony of the foreman, who has had a wide experience, that the use of movable benches is universal, and that they are suitable and safe. We do not construe the testimony relied on as altogether supporting the argument. It reads in part as follows (counsel for defendant examining his own witness), to wit:

"Q. Is or not that platform the general appurtenance that is used in the various plants with which you have been personally connected? A. There is always a platform of some description. Q. Were or were not the appliances of the Crescent City Company different from those of the various other plants with which you had previously been connected? A. They are all on the same line, but every house has different ideas. Q. So therefore, as I understand you, eliminating the details, the vat, the skimmer, and this portable stool used by the Crescent City Slaughterhouse Company is the same as that of all various plants throughout the country with which you have been connected for the last sixteen years? A. Yes, sir."

It is, however, the details thus eliminated that make all the difference. Elsewhere in his testimony the witness states that in some of the plants to which he refers no platforms are used at all, the skimming being done from the floor, and he nowhere says that he ever saw used a movable bench which was not secured in some way to prevent it from slipping back or tilting over. Such a bench, with hooks attaching it to the vat or secured in some such way as ladders leading to high shelves in retail stores are secured, might be safe enough; but the bench furnished to the deceased was not so secured, and the top extends over the supports in such a way that it is liable to be tilted or turned over by weight imposed either upon the rear edge or the ends. The witness also testifies, in another place (referring to the matter now under consideration), that a stationary object is safer than a movable one, and that there was no reason why the oil vats should not have been provided with a stationary platform. There is no doubt that immediately after the accident the bench in question was found with at least one end of it standing away from the vat, and, if it slipped or moved back while the deceased was leaning over, perhaps barely balanced, it would have made no difference that it slipped at one end only, and only six inches, since a quarter of an inch might have been enough to have precipitated him into the vat. As corroborative of the idea suggested by the position of the bench, we have the testimony of Sabatier, to the effect that the deceased, at a time not suspicious and as part of the res gestæ, said that the bench slipped. It is true that counsel for defendant in his cross-examination somewhat confused the witness so that he appears to contradict himself, but we think the contradiction is more apparent than real, and that when at one time he testifies that Parrenin said that he slipped, or his foot slipped, and at another that the bench slipped, it was merely because he did not appreciate the difference. When, however, his attention was called to it, he repeated that the injured man said that the bench slipped, thus:

"Q. I ask you, Mr. Sabatier, whether Mr. Parrenin, while you were taking off his clothes, whether he told you anything about the bench? A. Yes, sir; he said that the bench slipped, and his left hand saved him, and he slipped. Q. You are positive he did refer to the bench? A.

Yes, sir; and when I went there, the bench was away from the vat."

Beyond this, it will be remembered that Stricker said:

"When I got up there, I did not know whether the fellow fell—whether he fell in the vat—and after he came down he claimed he fell in the neat's-foot oil vat, and the bench was six inches away."

And it appears, further, that defendant's secretary and its general manager, upon the occasion of their visit to the scene, several hours after the accident, discussed the possibility of the bench having slipped, a circumstance from which it would appear that that idea had already been suggested.

It is earnestly contended that the danger of falling into the vat "was plain, open, and apparent, and was as fully known to Parrenin as it was to the foreman." It must, however, be borne in mind that Parrenin was youthful and inexperienced in skimming from the movable bench in question, and defendant had no right to increase the risk resulting to him from these causes by supplying him with appliances which were in themselves unsafe and unsuitable. It is the duty of those employing persons of whom, from their youth, ignorance, or inexperience, it may be assumed that they are unlikely to use the precautions of age, knowledge, and experience to protect them, as far as is reasonably possible, from the consequences of their failure so to do. And, whether the employé be young or old, ignorant or well informed, inexperienced or otherwise, the employer must furnish him with a reasonably safe place and with reasonably safe appliances in, and with, which to do his work, or else must show, where injury is sustained, that the employé knew, or, all things considered, ought to have known, the danger to which he was subjected. We do not think that, in the instant case, those conditions have been fulfilled by defendant, and therefore conclude that it

has properly been held liable. In view of the fact that the minor did not live at the same place with plaintiffs, and for aught that appears, would never again have done so, and did not contribute to their support, we do not find that the amount awarded them ($2,500) should be increased. It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed, at the cost of appellant.

LAND, J. I take no part, not having heard the argument.